| | | |
|---|---|---|
| **RANDY J. MADDEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:06CV44 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Randy Madden for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 15). Defendant has filed a Brief in Support of the Answer. (Doc. No. 16).

## Procedural History

On June 25, 2001, plaintiff filed his application for Disability Insurance Benefits and Supplemental Security Income, claiming that he became unable to work due to his disabling

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

condition on October 7, 2000. (Tr. 51-53, 201-02). This claim was denied initially (Tr. 15, 34-38, 191, 193-97), and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated June 17, 2002 (Tr. 6-14). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on August 30, 2002. (Tr. 4, 2-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.     ALJ Hearing

Plaintiff's administrative hearing was held on March 29, 2002. (Tr. 207). Plaintiff was present and was represented by counsel. (Id.). Also present were vocational expert Dr. Arthur Smith, and witness Evelyn Warren. (Id.). Plaintiff's attorney stated that plaintiff had been trying to work in a restaurant washing dishes three days a week for three-hour shifts for the past month-and-a-half. (Id.). The ALJ then admitted the exhibits into the record. (Tr. 208).

Plaintiff's attorney then examined plaintiff, who testified that he was 43 years of age and had an eighth grade education. (Tr. 210). Plaintiff stated that he did not receive any vocational training. (Id.). Plaintiff testified that he was divorced and had five children, three of which were under the age of eighteen. (Id.). Plaintiff stated that he had been married three times, although he married the same woman two times. (Id.).

Plaintiff testified that his last job before his current part-time job was working at Martin Hills, which is a boarding home for handicapped people. (Id.). Plaintiff stated that he performed housekeeping duties at Martin Hills. (Tr. 212). Plaintiff testified that he worked eight to ten hours a day at this position and he was on his feet all day. (Id.). Plaintiff stated that he worked at

Martin Hills for about a year. (Id.).

Plaintiff testified that prior to working at Martin Hills, he worked as a roofer, carpenter, restaurant worker, and farm worker. (Id.). Plaintiff stated that he drove a tractor on his uncle's farm in Arkansas. (Id.). Plaintiff testified that he worked as a laborer rather than performing carpentry work, although he did some sawing and measuring of lumbar. (Tr. 213).

Plaintiff stated that at the time of the hearing, he was working at Cowtown Café in Bloomfield, which is a restaurant that operates on the weekends. (Id.). Plaintiff testified that he washes dishes at Cowtown Café. (Id.). Plaintiff stated that he has been working at Cowtown Café for six weeks. (Id.). Plaintiff testified that he works five to five-and-a-half hour shifts two days a week. (Tr. 214). Plaintiff stated that he has to stand at this position, although he rests his left leg on a chair if his foot begins to hurt. (Id.). The ALJ stated that plaintiff demonstrated this technique by putting his left knee on a chair and supporting himself on his left knee and his right foot. (Id.). Plaintiff testified that the only lifting the position requires is taking out trash bags, which weigh about 40 pounds. (Tr. 215). Plaintiff stated that if the bags are too full, he takes trash out to bring the weight down to about 20 pounds. (Id.). Plaintiff testified that he carries out about six bags of trash a day. (Id.). Plaintiff stated that he carries the bags of trash to the dumpster, which is a distance of about ten feet. (Id.).

Plaintiff testified that he suffers from depression, Tourette's Syndrome,[2] nervousness, and a left ankle impairment. (Id.). Plaintiff stated that he also has lower back pain. (Tr. 216).

---

[2]A tic disorder appearing in childhood, characterized by multiple motor tics and vocal tics present for longer than 1 year. Obsessive-compulsive behavior, attention-deficit disorder, and other psychiatric disorders may be associated. Stedman's Medical Dictionary, 1916 (28th Ed. 2006).

Plaintiff testified that he has lower back pain when he wakes up in the morning and when he gets off from work. (Id.). Plaintiff stated that his back hurts when he works too much or lifts heavy things. (Id.). Plaintiff testified that he cannot stand or sit straight due to his back pain. (Id.). Plaintiff stated that his back hurts after taking out the trash at work. (Tr. 217). Plaintiff testified that he is paid $7.00 an hour at Cowtown Café. (Id.). Plaintiff stated that he usually works fourteen to fourteen-and-a-half hours a weekend. (Id.). Plaintiff testified that he cannot bend when his back hurts. (Id.). Plaintiff stated that standing for long periods while he is working aggravates his back. (Id.). Plaintiff testified that after working for three hours, his back is stiff and sore. (Id.). Plaintiff stated that he takes pain medication for his back. (Id.).

Plaintiff testified that he injured his left ankle while working at Martin Hills. (Id.). Plaintiff stated that a resident grabbed him from behind and caused him to twist his ankle. (Tr. 218). Plaintiff testified that he was taken to the hospital, where they put a cast on his ankle. (Id.). Plaintiff stated that he has seen several doctors for his ankle. (Id.). Plaintiff testified that he is pursuing a Workmen's Compensation claim. (Id.). Plaintiff stated that Workmen's Compensation scheduled an MRI. (Id.). Plaintiff testified that Dr. Craig E. Aubuchon performed surgery on his ankle. (Tr. 219).

Plaintiff stated that at the time of the hearing, his ankle was hot on the inside, swollen, and the side hurt constantly. (Id.). Plaintiff testified that he wears an ankle brace, which was prescribed by Dr. Aubuchon. (Id.). Plaintiff stated that his ankle pain is aggravated if he is on his feet for over an hour. (Id.).

Plaintiff testified that he places his ankle on a chair and supports himself with his left knee while he is working. (Id.). Plaintiff stated that his ankle is swollen after working three hours at

Cowtown Café. (Tr. 220). Plaintiff testified that he could not work more than three hours at a time because his foot would hurt. (Id.). Plaintiff stated that his foot is very swollen after working three days at Cowtown Café. (Id.). Plaintiff testified that he could not work eight hours a day, five days a week at his job at Cowtown Café or at any other job at which he could support himself on his left knee occasionally. (Tr. 221). Plaintiff stated that he cannot stand that long, but if it were a job that allowed him to sit, it would be different. (Id.).

Plaintiff testified that he has Tourette's Syndrome, which causes him to touch things often. (Id.). Plaintiff stated that the Tourette's Syndrome affects his sleep, because he cries, laughs, and talks in his sleep, and has nightmares. (Id.). Plaintiff testified that the Tourette's Syndrome causes him to jerk. (Id.). Plaintiff stated that the Tourette's Syndrome is aggravated when he is nervous and when he is around a lot of people. (Tr. 222). Plaintiff testified that working for extended periods at Cowtown Café does not affect his Tourette's Syndrome. (Id.).

Plaintiff stated that he has difficulty holding on to items with his hands. (Id.). Plaintiff testified that when he gets nervous, he drops things. (Id.). Plaintiff stated that he drops dishes at Cowtown Café. (Id.). Plaintiff testified that his employer understands when he drops things. (Id.). Plaintiff stated that the dishes do not break when he drops them. (Id.). Plaintiff testified that he has difficulty picking the dishes up if he has been working for an extended period and his back hurts. (Tr. 223).

Plaintiff testified that he suffers from depression. (Id.). Plaintiff stated that when he is depressed, he wants to be alone. (Id.). Plaintiff testified that he does not wait tables at Cowtown Café because he is too nervous. (Id.). Plaintiff stated that he does not fill orders in the kitchen. (Id.). Plaintiff testified that stress bothers him. (Id.). Plaintiff stated that he has always been a

nervous person.  (Id.).  Plaintiff testified that he has crying spells once or twice a week.  (Id.).  Plaintiff stated that he has never missed work at Cowtown Café.  (Id.).  Plaintiff testified that his crying spells usually last 15 to 20 minutes.  (Tr. 224).

Plaintiff testified that he can walk about a block, although he has significant foot pain.  (Id.).  Plaintiff stated that his ankle also starts hurting and burning.  (Id.).

Plaintiff testified that sitting is not a problem.  (Id.).  Plaintiff stated that he props his left leg on a chair when he sits.  (Id.).

Plaintiff testified that he can lift 20 to 25 pounds before his lower back begins to hurt.  (Id.).  Plaintiff stated that when he worked as a carpenter, he lifted shingles, which weighed 90 to 110 pounds.  (Id.).  Plaintiff testified that he occasionally lifted two bundles of shingles.  (Id.).

Plaintiff testified that he has a driver's license and he drives.  (Tr. 225).  Plaintiff stated that he drives to Dexter, which is eight to ten miles from his home.  (Id.).  Plaintiff testified that Dexter is as far as he drives.  (Id.).  Plaintiff stated that he only has problems driving if he is nervous.  (Id.).  Plaintiff testified that if he is nervous, he drives recklessly and is afraid of getting into an accident.  (Id.).

Plaintiff stated that he lives with his stepmother.  (Id.).  Plaintiff testified that his stepmother does most of the grocery shopping although he occasionally shops if it is necessary.  (Tr. 226).  Plaintiff stated that he does not visit anyone or engage in any hobbies.  (Id.).  Plaintiff testified that he used to enjoy fishing but he does not fish anymore.  (Id.).  Plaintiff stated that he does not go to the movies, go to church, or go to taverns.  (Id.).  Plaintiff testified that he goes to a coffee shop to eat breakfast with his stepmother about once a week.  (Id.).  Plaintiff stated that he usually watches television all day.  (Id.).

Plaintiff testified that he does not have any income other than his earnings from Cowtown Café.  (Id.).  Plaintiff stated that he is having problems with his pending Workers' Compensation claim.  (Tr. 227).  Plaintiff testified that the Workers' Compensation insurance carrier is bankrupt.  (Id.).  Plaintiff stated that he had not received any Workers' Compensation benefits as of the date of the hearing.  (Id.).

The ALJ then examined plaintiff, who testified that he has had Tourette's Syndrome all his life.  (Id.).  Plaintiff stated that he was able to perform his job satisfactorily despite having Tourette's Syndrome, although his co-workers made fun of him.  (Id.).  Plaintiff testified that his Tourette's Syndrome causes him to touch things multiple times every time he passes the thing.  (Tr. 228).

Plaintiff stated that he has suffered from depression for ten to fifteen years due to divorces, his mother's death, and the way he was treated by his first step-mother.  (Id.).  Plaintiff testified that he does not see a psychiatrist or psychologist because he does not have the funds to do so.  (Tr. 229).  Plaintiff stated that he has never been under the care of a psychiatrist or psychologist at any time in his life.  (Id.).  Plaintiff testified that he takes anti-depressant medication that is prescribed by his family doctor.  (Id.).

Plaintiff stated that he does not think his left ankle is healed because it is swollen.  (Id.).  Plaintiff testified that in addition to breaking the bone in his ankle, he tore some ligaments.  (Id.).  Plaintiff stated that Dr. Newell told him that he may have also injured veins in his ankle, which may be the cause of his pain and swelling.  (Id.).  Plaintiff testified that he wears a brace on his ankle.  (Id.).  Plaintiff showed his ankle to the ALJ, who noted that the ankle was "slightly swollen on the inside portion of the ankle as opposed to the right."  (Tr. 230).  The ALJ stated

that he did not see a great deal of swelling.  (<u>Id.</u>).  Plaintiff stated that his ankle is more swollen when he is on his feet.  (<u>Id.</u>).

Plaintiff testified that the day prior to the hearing was a normal day for him.  (Tr. 231).  Plaintiff stated that on the day prior to the hearing, he was around the house most of the day.  (<u>Id.</u>).  Plaintiff testified that he sits more than he stands in a normal day.  (<u>Id.</u>).  Plaintiff stated that the day prior to the hearing, he was on his feet a total of three to four hours.  (<u>Id.</u>).  Plaintiff testified that the longest he is on his feet at one time when he is home is forty-five minutes to an hour.  (<u>Id.</u>).  Plaintiff stated that when he is working, he can take a break about every hour.  (<u>Id.</u>).

Plaintiff testified that he injured his back when he was involved in an automobile accident when he was young.  (Tr. 232).  Plaintiff stated that he also injured his back packing shingles on the roof.  (<u>Id.</u>).  Plaintiff testified that he has seen a chiropractor several times for his back.  (<u>Id.</u>).  Plaintiff stated that he has not undergone surgery for his back.  (<u>Id.</u>).  Plaintiff testified that he has not undergone MRIs, CAT scans, or x-rays of the back.  (<u>Id.</u>).  Plaintiff stated that he has only seen a chiropractor, who adjusts his back without taking x-rays.  (<u>Id.</u>).

Plaintiff testified that he would be better off working at a job where he could sit.  (<u>Id.</u>).  Plaintiff stated that he has not looked for a job that would allow him to sit because he does not know of any such jobs.  (Tr. 233).  Plaintiff testified that he could probably work at a factory assembly type job.  (<u>Id.</u>).  Plaintiff stated that he would like a factory assembly job but they usually require a high school education.  (<u>Id.</u>).  Plaintiff testified that he only completed the eighth grade.  (<u>Id.</u>).

Plaintiff stated that he can read and write but he cannot read very well.  (<u>Id.</u>).  Plaintiff testified that he can read well enough to read and understand a newspaper.  (<u>Id.</u>).  Plaintiff stated

that he does not comprehend big words. (Id.). Plaintiff testified that he can add, subtract, and multiply, but he cannot divide. (Tr. 234). Plaintiff stated that he can make change at the grocery store. (Id.).

Plaintiff testified that he was five feet, nine inches tall, and weighed 175 pounds. (Id.). Plaintiff stated that his weight has remained the same for about five years. (Id.). Plaintiff testified that he was right-handed. (Id.).

Plaintiff stated that he drives occasionally. (Id.). Plaintiff testified that he drives a 1996 Buick with an automatic transmission. (Id.). Plaintiff stated that he can also drive a manual transmission. (Tr. 235). Plaintiff testified that the longest distance he had driven in the past six months was about 50 miles to Arkansas. (Id.). Plaintiff stated that he is too nervous to perform a driving job such as a dump truck driver or chauffeur. (Id.). Plaintiff testified that he is not a good driver because he shakes when he is nervous. (Id.).

Plaintiff stated that he has done some assembly work in the past. (Id.). Plaintiff testified that he worked at a steel company assembling drills. (Id.). Plaintiff stated that he could probably perform this job while sitting. (Tr. 236). Plaintiff testified that he only performed this position for a brief time before he was moved to a molding machine. (Id.). Plaintiff stated that this position involved sitting down and standing. (Id.). Plaintiff testified that he could probably perform this position at the time of the hearing. (Id.). Plaintiff stated that the job was in Arkansas. (Id.). Plaintiff testified that he left this position to build aluminum campers with his brother. (Tr. 237).

Plaintiff stated that he takes Xanax[3] and Vicodin.[4]  (Id.).  Plaintiff testified that he does not experience any side effects from his medication.  (Id.).  Plaintiff stated that he believes his medication is helping him.  (Id.).

Plaintiff testified that he enjoys watching television because he cannot go outside and walk or mow the grass.  (Id.).  Plaintiff stated that he watches mostly the news and talk shows.  (Tr. 238).  Plaintiff testified that he occasionally rents movies.  (Id.).  Plaintiff stated that he does not engage in any hobbies.  (Id.).  Plaintiff testified that he does not have any close friends.  (Id.).

Plaintiff stated that he has no source of income other than his earnings from working two-and-a-half days a week.  (Id.).  Plaintiff testified that he does not receive Medicaid benefits but, rather, he pays out of pocket for the medical treatment he receives.  (Id.).

Plaintiff stated that he sees a doctor when his medication runs out.  (Id.).  Plaintiff testified that his doctor charges him $48.00 for each visit, even when he just renews plaintiff's prescriptions.  (Id.).  Plaintiff stated that his doctor will not renew his prescriptions unless he comes in for a visit.  (Tr. 239).  Plaintiff testified that he sees his doctor every two weeks to two months.  (Id.).  Plaintiff stated that his Xanax costs about $16.00 for a thirty-day supply, and his Vicodin costs about $14.00 for a thirty-day supply.  (Id.).  Plaintiff testified that he takes his Xanax daily and he takes the Vicodin when he is in pain.  (Id.).

Plaintiff stated that Dr. Newell has not placed any restrictions on him but only told him not to drive after taking the Xanax because it causes drowsiness.  (Id.).  Plaintiff testified that he

---

[3]Xanax is indicated for the management of anxiety disorder.  See Physician's Desk Reference (PDR), 2794 (57th Ed. 2003).

[4]Vicodin is indicated for the relief of moderate to moderately severe pain.  See PDR at 509.

notices that the Xanax makes him drowsy.  (Id.).  Plaintiff stated that he occasionally nods off after taking Xanax.  (Tr. 240).  Plaintiff testified that he takes the Xanax in the morning after he eats breakfast and again before he goes to bed at night.  (Id.).  Plaintiff stated that the Xanax helps him sleep better.  (Id.).

Plaintiff testified that he takes naps during the day to make up for lost sleep.  (Id.).  Plaintiff stated that he usually takes just one three-hour nap during the day.  (Id.).  Plaintiff testified that he usually takes his nap after lunch.  (Id.).  Plaintiff stated that he actually sleeps during his nap and feels refreshed when he wakes up.  (Id.).

Plaintiff testified that his step-mother is occasionally at home with him during the day.  (Tr. 241).  Plaintiff stated that his step-mother is his only contact with people.  (Id.).  Plaintiff testified that he talks with his step-mother and enjoys her company.  (Id.).

Plaintiff stated that he picks up after himself.  (Id.).  Plaintiff testified that he washes dishes that he uses and folds laundry.  (Id.).  Plaintiff stated that he occasionally makes his bed.  (Id.).  Plaintiff testified that he sometimes uses a riding mower to mow the lawn.  (Id.).  The ALJ stated that one of plaintiff's doctors noted that plaintiff was able to push the lawn mower for two hours at a time.  (Id.).  Plaintiff testified that this was true.  (Tr. 242).  Plaintiff stated that his foot has worsened since that time and he is no longer able to operate the push mower for two hours.  (Id.).  Plaintiff testified that he fell down the steps a week prior to the hearing and may have re-injured his ankle.  (Id.).

Plaintiff stated that he does not run or jog.  (Id.).  Plaintiff testified that he has never tried to jog but he thinks it would be hard on his ankle.  (Id.).

Plaintiff stated that he drives about every two days.  (Id.).  Plaintiff testified that he drives

to Dexter to buy groceries.  (Tr. 243).  Plaintiff stated that the heaviest item he has lifted in the past thirty days are the trash bags he lifts at work that weigh 20 to 25 pounds.  (Id.).  Plaintiff testified that he would be strong enough to jack up his car and change a tire if he had a flat.  (Id.).  Plaintiff stated that he would use a "cheater bar" to break the lug nuts loose.  (Id.).

Plaintiff testified that his back was not hurting during the hearing and he was not experiencing any pain.  (Id.).  Plaintiff stated that his ankle was burning a little during the hearing.  (Id.).  Plaintiff testified that his ankle pain would increase immediately to a 33 on a scale of 1 to 100, if he stood up and put his weight on it.  (Tr. 244).  Plaintiff stated that his pain would increase the longer he stood.  (Id.).

Plaintiff testified that when he ends his shift on Saturday or Sunday, he has to come home and soak his foot in hot water.  (Id.).  Plaintiff stated that he tried applying ice to his ankle but it did not help.  (Tr. 245).  Plaintiff testified that hot water seems to soothe his ankle.  (Id.).

Plaintiff's attorney then re-examined plaintiff, who testified that he has not tried driving a dump truck since breaking his ankle.  (Id.).  Plaintiff stated that he has never driven a dump truck.  (Id.).  Plaintiff testified that he does not think he could push the clutch down on a dump truck because it would cause his ankle to hurt.  (Tr. 246).

Plaintiff stated that when he is under stress, he becomes really nervous.  (Id.).  Plaintiff testified that if he were working on a production line which required him to assemble a certain number of small electrical drills he would be really nervous and would be unable to perform the job.  (Id.).  Plaintiff stated that he would probably not be able to assemble the drills properly. (Id.).  Plaintiff testified that he has problems concentrating when he is under stress or nervous. (Id.).  Plaintiff stated that he is unable to concentrate when he is working in stressful conditions.

(Id.). Plaintiff testified that he becomes nervous when he is around big groups of people. (Tr. 247). Plaintiff stated that he would become nervous if he were not meeting a production quota at work. (Id.).

Plaintiff testified that he does not perform household chores such as vacuuming, sweeping, or mopping. (Id.). Plaintiff stated that he lives with his step-mother and his step-brother Ricky. (Id.). Plaintiff testified that Ricky is 45. (Id.).

The ALJ then re-examined plaintiff, who testified that his children are living with their mother. (Id.). Plaintiff stated that he planned to see his children the day after the hearing. (Tr. 248). Plaintiff testified that he calls his children about once a month. (Id.). Plaintiff stated that when he visits his children, he usually takes them out to eat. (Id.). Plaintiff testified that his children are ages 10, 8, and 6. (Id.). Plaintiff stated that he also has two children that are grown, who are 25 and 22. (Id.).

Plaintiff's attorney then examined plaintiff's step-mother, Evelyn Warren, who testified that she lives in Bloomfield, Missouri. (Id.). Ms. Warren stated that plaintiff has lived with her for three years. (Tr. 249). Ms. Warren testified that plaintiff used to operate a push mower to mow the yard but he cannot concentrate long enough to mow the whole yard. (Id.). Ms. Warren stated that plaintiff operated the push mower for two hours but could not complete the yard in that time. (Id.). Ms. Warren testified that plaintiff never finishes the job. (Id.). Ms. Warren stated that plaintiff can only concentrate on a task for fifteen to twenty minutes and then he moves on to another task. (Id.).

Ms. Warren testified that plaintiff washes dishes occasionally and performs small household chores. (Tr. 250). Ms. Warren stated that plaintiff washes dishes for ten to fifteen

minutes.  (Id.).  Ms. Warren testified that she helps plaintiff with the dishes.  (Id.).

Ms. Warren stated that she picks plaintiff up from work at Cowtown Café.  (Id.).  Ms. Warren testified that when she picks plaintiff up from work, he is bent forward and is in pain.  (Id.).  Ms. Warren stated that plaintiff soaks his left foot when he gets home from work two to three times a week.  (Id.).  Ms. Warren testified that plaintiff's left foot and ankle are swollen after he works at Cowtown Café.  (Tr. 251).  Ms. Warren stated that plaintiff complains of pain in his left foot and ankle after working.  (Id.).  Ms. Warren testified that plaintiff also complains of back pain.  (Id.).

Ms. Warren stated that plaintiff occasionally goes shopping with her.  (Id.).  Ms. Warren testified that she gives plaintiff a very short list of items to buy.  (Id.).  Ms. Warren stated that she has never given plaintiff a list of a week's worth of groceries to buy.  (Tr. 252).

Ms. Warren testified that the farthest plaintiff drives is five or six miles to Dexter.  (Id.).  Ms. Warren stated that plaintiff usually just drives three to four blocks to the post office.  (Id.).

Ms. Warren testified that plaintiff watches television most of the day.  (Id.).  Ms. Warren stated that plaintiff does not garden.  (Id.).  Ms. Warren testified that plaintiff reads the paper for ten to fifteen minutes.  (Id.).  Ms. Warren stated that plaintiff moves around and does other things while watching television.  (Id.).  Ms. Warren testified that plaintiff walks around because he is nervous.  (Tr. 253).

Ms. Warren stated that plaintiff's Tourette's Syndrome causes him to cry and then go to bed.  (Id.).  Ms. Warren testified that plaintiff gets up between 1:00 and 2:00 a.m. and watches televison.  (Id.).  Ms. Warren stated that plaintiff does not sleep through the night.  (Id.).  Ms. Warren testified that plaintiff has nightmares and sometimes talks, laughs, and cries in his sleep.

(Id.).  Ms. Warren stated that plaintiff takes naps during the day.  (Id.).  Ms. Warren testified that plaintiff goes to bed between 9:30 and 10:00 p.m. and gets up at 2:00 a.m.  (Id.).  Ms. Warren stated that when plaintiff gets up at 2:00 a.m., he stays up until he takes his afternoon nap.  (Id.).

Ms. Warren testified that she helped plaintiff get his job at Cowtown Café.  (Id.).  Ms. Warren stated that she asked the restaurant owner if there were any positions that plaintiff could perform.  (Id.).  Ms. Warren testified that the restaurant owner told her that plaintiff could wash dishes.  (Tr. 254).  Ms. Warren stated that plaintiff is not the only dishwasher on any given night at Cowtown Café.  (Id.).

Ms. Warren testified that she has observed plaintiff's periods of depression.  (Id.).  Ms. Warren stated that plaintiff cries when he is depressed.  (Id.).  Ms. Warren testified that she has seen plaintiff cry every week for two to three days, for periods of ten or fifteen minutes.  (Id.).  Ms. Warren stated that plaintiff wants to be alone and that he has no friends.  (Tr. 255).  Ms. Warren testified that she is plaintiff's only friend.  (Id.).  Ms. Warren stated that plaintiff has no girlfriends.  (Id.).  Ms. Warren testified that if she did not take care of plaintiff, he would have no one to take care of him.  (Id.).

Ms. Warren stated that plaintiff takes care of his personal hygiene.  (Id.).  Ms. Warren testified that plaintiff occasionally washes the dishes.  (Id.).  Ms. Warren stated that plaintiff picks up clothes but does not vacuum or dust.  (Tr. 255-56).  Ms. Warren testified that she has never asked plaintiff to vacuum or dust because he would not do a thorough job.  (Tr. 256).

Ms. Warren stated that plaintiff drops things frequently.  (Id.).  Ms. Warren testified that plaintiff drops dishes, food, or whatever else he holds.  (Id.).  Ms. Warren stated that plaintiff bumps into things when he walks down the hall.  (Id.).  Ms. Warren testified that plaintiff also

compulsively touches things and turns lights on and off.  (<u>Id.</u>).  Ms. Warren stated that plaintiff has been compulsively touching things due to his Tourette's Syndrome since she met him fifteen years prior to the hearing.  (Tr. 257).  Ms. Warren testified that plaintiff also "hollers and says goofy stuff," due to his Tourette's Syndrome.  (<u>Id.</u>).

Ms. Warren stated that plaintiff is a good-natured person who does what he can to help her.  (<u>Id.</u>).

Ms. Warren testified that plaintiff's ankle swells when he stands on it.  (<u>Id.</u>).

Ms. Warren stated that plaintiff complains of back pain.  (<u>Id.</u>).

The ALJ then examined Ms. Warren, who testified that plaintiff has lived with her for about three years.  (<u>Id.</u>).  Ms. Warren stated that plaintiff had a problem with alcohol when he first came from Arkansas to live with her.  (Tr. 258).  Ms. Warren testified that she sent plaintiff to rehab in Poplar Bluff, which was successful.  (<u>Id.</u>). Ms. Warren stated that plaintiff no longer drinks since completing rehab.  (<u>Id.</u>).  Ms. Warren testified that plaintiff was drinking heavily prior to entering rehab.  (<u>Id.</u>).  Ms. Warren stated that plaintiff did not go out and drink but, rather, he only drank at home.  (<u>Id.</u>).

Ms. Warren testified that she has received positive feedback from plaintiff's employer.  (<u>Id.</u>).  Ms. Warren stated that the people at plaintiff's place of employment like plaintiff.  (<u>Id.</u>).  Ms. Warren testified that plaintiff is nervous and drops things but his employer does not mind because he knows plaintiff.  (<u>Id.</u>).  Ms. Warren stated that if plaintiff were to start a job where the owner was not familiar with him or his condition, he would not last more than a couple days.  (Tr. 258).  Ms. Warren testified that plaintiff is very sensitive to criticism and is easily upset.  (<u>Id.</u>).  Ms. Warren stated that plaintiff would get upset at a place where he did not know anyone and

would leave the job.  (Id.).

Plaintiff's attorney then re-examined Ms. Warren, who testified that plaintiff cannot operate under stress.  (Id.).  Ms. Warren stated that she has observed plaintiff trying to work under stress and he gets his feelings hurt.  (Id.).  Ms. Warren testified that plaintiff also gets hurt physically, which is why she will not allow him to operate the riding lawn mower.  (Id.).  Ms. Warren stated that the day prior to the hearing, plaintiff sustained a six-inch cut on his arm when he was trying to strip rubber off of a wire.  (Tr. 260).  Ms. Warren testified that she taped plaintiff's arm.  (Id.).

The ALJ then examined the vocational expert, Dr. Arthur Smith, who testified that if the testimony of plaintiff and his step-mother were to be found fully credible, plaintiff would not be able to engage in any form of work activity.  (Id.).  Dr. Smith stated that plaintiff would not be able to work due to a combination of factors, including his ankle, pain, difficulty holding things, and crying spells.  (Tr. 261).

The ALJ asked Dr. Smith to assume that plaintiff had the following limitations: lift up to 50 pounds occasionally, 25 pounds frequently; stand, walk, and sit six hours in an eight-hour workday; never climb ladders, ropes, and scaffolding; could not engage in work where balancing of his body is critical in the performance of his work; should not walk on uneven or slippery surfaces; and must avoid concentrated exposure to vibration of the body.  (Id.).  The ALJ told Dr. Smith to assume that plaintiff also has a combination of mental disorders including an affective disorder, anxiety disorder, history of substance addiction disorder, possible dependent personality, which cause the following limitations: cannot engage in work that is complex or detailed; requires simple, routine, repetitive work; requires work where he does not have to interact with co-

workers or the general public where that interaction is critical to the performance of his task; and requires low-stress work. (Tr. 261-62). Dr. Smith testified that plaintiff would be able to perform his past work as a molding machine operator because this is not considered to be a stress-producing environment. (Tr. 262). Dr. Smith stated that plaintiff could perform his past work as a janitor at the boarding home but could not perform work as a dishwasher due to the possible slippery surface. (Id.). Dr. Smith testified that in combination there are approximately 65,000 janitorial and molding machine operation jobs at the medium level in the state and at least 50 times that number in the national economy. (Id.).

The ALJ then posed the following hypothetical to Dr. Smith: plaintiff is limited to light lifting with the same other limitations as in the previous hypothetical. (Id.). Dr. Smith testified that there would be about 300 light molding machine operator jobs in the state. (Tr. 263). Dr. Smith stated that there are other light, low level, semi-skilled jobs that would include some punching and stamping, press machines, and some photographic machine operating jobs. (Id.). Dr. Smith testified that in combination there are about 3,000 such jobs in the state and fifty times that number in the national economy. (Id.).

The ALJ then asked Dr. Smith to assume that plaintiff is limited to light work as in the prior hypothetical, but with the following additional limitations: alternate sit/stand work, where he cannot be on his feet for longer than an hour at a time before being allowed to sit, and on his feet for no more than four hours total in a workday. (Tr. 264). Dr. Smith testified that the jobs he cited could not be performed at the light level with one hour standing and one hour sitting. (Id.). Dr. Smith stated that plaintiff would be able to perform some other jobs of an unskilled nature. (Id.). Dr. Smith stated that plaintiff could perform unskilled jobs such as school bus monitor and

some machine operating jobs.  (Id.).  Dr. Smith testified that plaintiff could also perform some sedentary jobs such as inspector and weigher, checker and examiner, and some machine tending occupations.  (Tr. 265).  Dr. Smith stated that he eliminated assembly jobs due to the low-stress limitation.  (Id.).  Dr. Smith testified that there are in combination about 4,000 light machine operation jobs in the state and about 6,000 sedentary inspector and checker jobs in the state.  (Id.).  Dr. Smith stated that there are about fifty times that number of positions at the national level.  (Id.).  Dr. Smith testified that these positions as they are described in the Dictionary of Occupational Titles are consistent with successful performance with the limitations set forth in the hypotheticals given by the ALJ.  (Id.).

Plaintiff's attorney next examined Dr. Smith, who testified that if plaintiff is found to be fully credible as to the stress and pain and all other limitations stated in his testimony, then he would not be able to perform any of the jobs described by Dr. Smith in response to the second, third, and fourth hypotheticals.  (Tr. 266).

The ALJ then re-examined Dr. Smith, who testified that a GAF of 50 indicates serious symptoms that would likely preclude work activity.  (Id.).  Dr. Smith stated that if the ALJ were to give weight to the finding by a psychologist that plaintiff had a GAF[5] of 50[6] then plaintiff would be unable to engage in any form of work activity.  (Id.).

---

[5]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. 1994) ("DSM IV").

[6]A GAF score of 41 to 50 denotes serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.

**B.    Relevant Medical Records**

The record reveals that plaintiff presented to Bloomfield Medical Clinic on November 22, 1999, with complaints of low back pain. (Tr. 184). He also requested refills of Xanax. (Id.). Dick J. Newell, D.O. administered trigger point injections in the right L3[7] area. (Id.). Dr. Newell prescribed Cogentin,[8] Diazepam,[9] and Ultram.[10] (Id.).

Plaintiff presented to Dr. Newell on February 28, 2000, for a refill of his Xanax. (Tr. 183). Dr. Newell's assessment was history of anxiety. (Id.). He noted that Xanax helps plaintiff's anxiety. (Id.). Dr. Newell prescribed Xanax. (Id.).

Plaintiff presented to Dr. Newell on July 24, 2000, for a refill of Xanax. (Tr. 181). Dr. Newell noted that plaintiff was a recovering alcoholic. (Id.). Plaintiff also complained of insomnia. (Id.). Dr. Newell's assessment was anxiety, alcohol abuse, and insomnia. (Id.). Dr. Newell decreased plaintiff's dosage of Xanax and noted that he would like to end the Xanax altogether within the next several months. (Id.).

Plaintiff presented to Craig E. Aubuchon, M.D. on February 8, 2001, for an independent

---

[7]Abbreviation for lumbar vertebrae (L1 to L5). Stedman's at 1037. The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[8]Cogentin is indicated for the treatment of parkinsonism. See PDR at 1957.

[9]Diazepam is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety. See PDR at 2964.

[10]Ultram is indicated for the management of moderate to moderately severe pain. See PDR at 2511.

medical examination of his left ankle.  (Tr. 162-65).  Plaintiff reported that he fractured his ankle

at work on October 7, 2000, when a patient jumped on his back causing him to twist his left

ankle.  (Id.).  Plaintiff stated that his ankle continued to swell.  (Id.).  Upon physical examination,

plaintiff had obvious swelling of the left ankle, was very tender on palpation of the ankle, and had

limited range of motion of the ankle.  (Tr. 163).  X-rays revealed a fracture of the lateral

malleolus,[11] which had healed.  (Tr. 164).  Dr. Aubuchon stated that the ankle joint itself was in

good position.  (Id.).  Dr. Aubuchon recommended anti-inflammatories, physical therapy, and an

MRI.  (Id.).  Dr. Aubuchon stated that plaintiff should not be on his feet more than thirty minutes

every two hours until the MRI is obtained to discern if there is something causing the continued

swelling and pain.  (Id.).

Plaintiff presented to Dr. Newell on February 13, 2001, advising that he had sustained a

neck injury during a motor vehicle accident the previous evening.  (Tr. 180).  Dr. Newell noted

that plaintiff was seen in the emergency room, where x-rays were taken, and plaintiff was told that

there were no problems.  (Id.).  Upon physical examination, plaintiff had full range of motion of

the cervical spine but he did have increased muscle spasms.  (Id.).  Dr. Newell's assessment was

most likely cervical spine sprain with pulled muscle.  (Id.).  He prescribed Vioxx[12] and Diazepam.

(Id.).

Plaintiff presented to Dr. Newell on February 19, 2001, with complaints of continued neck

pain, pain in his right rib area, difficulty breathing, occasional headaches, and low back pain.  (Tr.

---

[11]The process at the lateral side of the lower end of the fibula (calf-bone), forming the
projection of the lateral part of the ankle.  Stedman's at 1147.

[12]Vioxx is indicated for the relief of osteoarthritis.  See PDR at 2122.

178).  Plaintiff had increased muscle spasms bilaterally in the lumbo-sacral spine area.  (Id.).  Dr. Newell's assessment was muscle spasms and sprain of cervical spine most likely due to motor vehicle accident; increased muscle spasm and sprain of lumbo-sacral spine secondary to motor vehicle accident; insomnia; and headaches.  (Id.).  Dr. Newell administered trigger point injections in the L3 area.  (Id.).  He prescribed Darvocet[13] for pain and Ambien[14] for insomnia.  (Id.).

Plaintiff presented to Dr. Newell on February 22, 2001, with complaints of bilateral knee pain but right knee primarily.  (Tr. 177).  Upon physical examination, Dr. Newell found that the right knee was slightly inflamed and slightly swollen.  (Id.).  Plaintiff walked with a limp and had slight decreased range of motion.  (Id.).  Plaintiff underwent x-rays of the knees, which were normal.  (Id.).  Dr. Newell's assessment was soft tissue injury to knee probably due to motor vehicle accident and possibly due to his knees hitting the dash in the accident.  (Id.).  Dr. Newell discontinued the Vioxx, and started plaintiff on Naprosyn.[15]  (Id.).

Plaintiff underwent an MRI of the left ankle on February 27, 2001.  (Tr. 148).  The impression of the reviewing physician was osteochondral lesion consistent with osteocondritis diseccans.[16]  (Id.).

In a letter dated March 1, 2001, Dr. Aubuchon stated that he had reviewed plaintiff's MRI, which revealed an osteochondral injury consistent with osteochondritis dissecans.  (Tr.

---

[13]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 3504.

[14]Ambien is indicated for the short-term treatment of insomnia.  See PDR at 2980.

[15]Naprosyn is indicated for the treatment of arthritis and osteoarthritis.  See PDR at 2892.

[16]Complete or incomplete separation of a portion of joint cartilage and underlying bone, usually involving the knee, associated with necrosis.  Stedman's at 1389.

161).  Dr. Aubuchon recommended arthroscopy with either removal of the cartilaginous fragment or bone grafting.  (Id.).  Dr. Aubuchon stated that he discussed surgery with plaintiff and plaintiff wished to proceed.  (Id.).

On April 4, 2001, Dr. Aubuchon performed a left ankle arthroscopy[17] with drilling of the osteochondral lesion.  (Tr. 150-51).  On April 10, 2001, Dr. Aubuchon stated that the incisions were healing without evidence of infection.  (Tr. 159).  Dr. Aubuchon stated that there was minimal swelling and no redness or drainage.  (Id.).  Dr. Aubuchon prescribed physical therapy and a home exercise program.  (Id.).  He stated that plaintiff would wear the boot for another two weeks and then wear a shoe.  (Id.).

Plaintiff presented to Dr. Aubuchon for a follow-up on May 8, 2001.  (Tr. 157).  Plaintiff reported feeling better since the surgery and no longer experiencing severe pain.  (Id.).  Plaintiff reported only discomfort and swelling in his ankle.  (Id.).  Upon physical examination, plaintiff's ankle was swollen and slightly tender.  (Id.).  Dr. Aubuchon recommended that plaintiff start wearing the boot for two more weeks.  (Id.).  He released plaintiff to sedentary work.  (Id.).

Plaintiff presented to Dr. Newell on May 10, 2001, with complaints of anxiety.  (Tr. 176).  Dr. Newell's assessment was anxiety with increased stress and fractured left foot.  (Id.).  He prescribed Xanax.  (Id.).

Plaintiff saw Dr. Aubuchon for a follow-up regarding his left ankle on June 6, 2001.  (Tr. 155).  Plaintiff reported that he had attended nine physical therapy sessions and felt that he did not need to go any longer.  (Id.).  Upon physical examination, plaintiff's ankle was still swollen, with some slight tenderness.  (Id.).  Plaintiff walked with a normal gait.  (Id.).  Dr. Aubuchon

---

[17]Endoscopic examination of the interior of a joint.  Stedman's at 162.

recommended that plaintiff do his home exercise program at least twice daily. (Id.). He released plaintiff to work with the restriction of sit-down breaks every two hours. (Id.).

Plaintiff saw Dr. Aubuchon for a follow-up on July 3, 2001. (Tr. 154). Upon physical examination, plaintiff had some swelling of the left ankle, some tenderness, and full range of motion of the ankle. (Id.). Plaintiff reported that he had been cutting his grass for two hours at a time. (Id.). Dr. Aubuchon recommended that plaintiff use an ankle brace and continue strengthening exercises. (Id.). Dr. Aubuchon found that plaintiff had reached maximum medical improvement and released him from his care. (Id.). He released plaintiff to work with the permanent restriction that he be allowed to sit for twenty minutes after being on his feet for four hours. (Id.).

J.M. Spence, Ph.D., a state agency medical consultant, completed a Psychiatric Review Technique on August 23, 2001. (Tr. 88-100). Dr. Spence found that plaintiff's history of depression, anxiety, Tourette's Disorder, and history of substance abuse caused the following limitations: mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 98).

A state agency consultant completed a Physical Residual Functional Capacity Assessment on August 24, 2001. (Tr. 79-87). The consultant expressed the opinion that plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about 6 hours in an 8-hour workday, sit for a total of 6 hours in an 8-hour workday, and push or pull an unlimited amount. (Tr. 80). The consultant found that plaintiff should only occasionally climb ladders, ropes, or scaffolds, but found no other structural, manipulative, visual, communicative, or environmental limitations. (Tr. 82-84).

On October 30, 2001, plaintiff presented to Thomas H. Carter, Ph.D. for a psychological consultation. (Tr. 168-72). Plaintiff reported that he dropped out of school in the ninth grade at the age of 16 or 17. (Tr. 169). Plaintiff stated that he was not very good at managing his money and that his friend Evelyn manages his finances. (Id.). Plaintiff reported that he suffers from Tourette's Syndrome, which causes him to touch things compulsively. (Id.). Plaintiff stated that he first noticed these symptoms at the age of nine. (Id.). Plaintiff indicated that he has been nervous and jumpy all of his life. (Id.). Plaintiff stated that he used to be depressed and that he tried to commit suicide on one occasion ten years ago by cutting himself with a piece of glass. (Id.). Plaintiff reported that he has trouble sleeping and that he has difficulty concentrating. (Tr. 170). Plaintiff indicated that he was taking Haloperidol[18] for his Tourette's Syndrome and Xanax for sleep. (Tr. 171). Plaintiff was not taking any medication for his pain or anxiety. (Id.). Upon examination, plaintiff appeared to suffer from mild to moderate anxiety. (Id.). Plaintiff had difficulty sitting still and appeared mildly to moderately fidgety and tense. (Id.). Dr. Carter stated that plaintiff's compulsion to touch objects and to repeat behaviors along with his hyperactivity of motor movement would lend weight to his diagnosis of Tourette's Syndrome. (Id.). Plaintiff's thought processes were rational, rapid, and coherent, while his insight and judgment seemed slightly impaired. (Id.). Testing revealed a low-average attention span and low-average immediate recall of isolated data. (Id.). Dr. Carter stated that plaintiff appeared capable of managing his own monies but due to excessive dependency, some degree of depression, and impulsivity in spending, may need some assistance with the spending of his monies. (Id.). Dr. Carter stated that plaintiff's interpretation of proverbs suggested that he has borderline to low

---

[18]Haloperidol is indicated for the treatment of schizophrenia. See PDR at 2464.

average abstract thinking ability. (Id.). Dr. Carter estimated plaintiff's level of intellectual functioning at high-borderline to low average. (Tr. 172). Plaintiff's ability to interpret everyday situations in a common-sense manner, ability to form concepts from verbal materials, and his fund of general information were within gross normal limits. (Id.). Dr. Carter stated that plaintiff appeared to have the ability to understand and remember both simple and moderately complex instructions, and the ability to sustain his concentration and persist toward the completion of simple and moderately complex tasks. (Id.). Dr. Carter found that plaintiff had mild deficits in his concentration, which were probably due to excessive nervousness. (Id.). Dr. Carter stated that plaintiff's social functioning was mildly impaired due to his excessive nervousness, mild depression, and his Tourette's Syndrome. (Id.). Dr. Carter's assessment was Tourette's Disorder, Depressive Disorder, Anxiety Disorder, and rule out Dependent Personality Disorder.[19] (Id.). He assessed a GAF of 50. (Id.).

Plaintiff presented to Jerome F. Levy, M.D. on October 16, 2001, for a consultation regarding his ankle. (Tr. 186-89). Plaintiff complained of constant ankle pain, which increases the longer he stands or walks. (Tr. 187). Upon physical examination, plaintiff walked without a limp. (Tr. 188). No obvious deformity was detected in the lower extremities other than some incisions around his ankle. (Id.). Plaintiff had full range of motion except for his left ankle, and no discomfort other than his left ankle. (Id.). Plaintiff's straight-leg raising was negative bilaterally. (Id.). Plaintiff's left ankle was considerably swollen and plaintiff exhibited slight diminished range of motion of the left ankle. (Id.). Dr. Levy diagnosed plaintiff with status post

---

[19]An enduring and pervasive pattern in adulthood characterized by submissive and clinging behavior and excessive reliance on others to meet one's emotional, social, or economic needs. Stedman's at 568.

fracture, left distal fibula, healed; chronic strain, left ankle; stiffness, left ankle; and status post atrophy, left lower extremity. (Id.). Dr. Levy expressed the opinion that plaintiff had a thirty-five percent permanent partial disability of the ankle. (Tr. 189).

## **The ALJ's Determination**

The ALJ made the following findings:

1.    The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.    The claimant has the following residual functional capacity: repetitive, unskilled, low-stress work with no lifting greater than 50 pounds occasionally and 25 pounds frequently, sitting and standing and/or walking no more than six hours in an eight-hour workday with normal breaks, no ladder climbing, no work with concentrated exposure to vibrations of the body, no work in which balancing of the body is a critical aspect of work tasks and no work that requires close social interactions with co-workers or the general public.

8.    The claimant's past relevant work as molding machine operator and janitor did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR §§ 404.1565 and 416.965).

9.      The claimant's medically determinable impairments do not prevent the claimant from performing his past relevant work.

10.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(e) and 416.920(e)).

(Tr. 13).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the applications filed on June 25, 2001, the claimant is not entitled to a Period of Disability and Disability Insurance Benefits and is not eligible for Supplemental Security Income payments under Sections 216(i), 223, 1602, and 1614(a)(3)(A) respectively, of the Social Security Act.

(Tr. 14).


## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.**    **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claim

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff contends that the ALJ applied an improper standard when assessing the pain suffered by plaintiff.  Defendant argues that the ALJ properly evaluated the credibility of plaintiff's subjective complaints using the framework set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski, 739 F.2d at 1322 (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as

a whole. The primary question is not whether plaintiff suffers from the impairments alleged; it is whether plaintiff is fully credible when he claims that the symptoms prevent him from engaging in his prior work. See Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of limitations to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling impairments. The ALJ first discussed the medical evidence. (Tr. 11). The ALJ found that the medical evidence does not support plaintiff's allegations of disability. (Id.). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). With regard to plaintiff's ankle impairment, the ALJ noted that on July 3, 2001, Dr. Aubuchon stated that plaintiff could return to work with the only restriction that he be allowed to sit for twenty minutes after being on his feet for four hours. (Tr. 11, 154). The ALJ pointed out that at that time, plaintiff still had some swelling and tenderness of the ankle, but he had good range of motion. (Id.).

With respect to plaintiff's mental impairments, the ALJ noted that Dr. Carter, the consulting psychologist, found that plaintiff's ability to interpret everyday situations in a common-sense manner, form concepts from verbal materials, and his fund of general information were within normal limits. (Tr. 11, 172). Dr. Carter found that plaintiff was capable of understanding and remembering simple and moderately complex instructions, and able to sustain concentration

and persistence on simple and moderately complex tasks. (Id.). Dr. Carter expressed the opinion that plaintiff's social functioning was only mildly impaired due to his nervousness, mild depression, and Tourette's Syndrome. (Id.). Dr. Carter's findings are not supportive of a disabling mental impairment. Further, although plaintiff takes Xanax for his insomnia and anxiety, he has never sought treatment from a psychiatrist or psychologist. Failure to seek medical treatment may be inconsistent with a finding of disability and can be considered in assessing a claimant's credibility. See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)

The ALJ next stated that although plaintiff experiences symptoms from his Tourette's Syndrome and an anxiety disorder, these symptoms have existed for many years and plaintiff was able to work with the symptoms. (Tr. 12). In fact, plaintiff testified that he could "probably" perform his past work as a molding machine operator. (Tr. 236). The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of a disabling impairment. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992). In addition, the ALJ pointed out that plaintiff was working part-time as the time of the hearing. (Tr. 12). Plaintiff's ability to work on a part-time basis during the time in which he alleges he was disabled is inconsistent with plaintiff's allegation of disability and may demonstrate an ability to perform substantial gainful activity. See 20 C.F.R. § 404.1571, 416.971; Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). As such, the ALJ properly determined that plaintiff's ability to work despite his impairments detracted from his credibility.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Each and every Polaski factor, however, need not be discussed in depth, so long as the ALJ points to the relevant factors and

gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of a disabling impairment are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

After properly determining that plaintiff's subjective complaints were not fully credible, the ALJ formulated the following residual functional capacity:

> Accordingly, the undersigned finds the claimant retains the following residual functional capacity: repetitive, unskilled, low-stress work with no lifting greater than 50 pounds occasionally and 25 pounds frequently, sitting and standing and/or walking no more than six hours in an eight-hour workday with normal breaks, no ladder climbing, no work with concentrated exposure to vibrations of the body, no work in which balancing of the body is a critical aspect of work tasks and no work that requires close social interactions with co-workers or the general public.

(Tr. 12).

The undersigned finds that the ALJ's residual functional capacity determination is supported by substantial evidence. Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity

finding must be supported by *some* medical evidence.  See Lauer, 245 F.3d at 704.

In this case, the residual functional capacity formulated by the ALJ is supported by the objective medical evidence.  The residual functional capacity combines the limitations found by Drs. Aubuchon and Carter.  Dr. Aubuchon released plaintiff to work with the only restriction that he be allowed to sit for twenty minutes after being on his feet for four hours.  (Tr. 154).  Dr. Carter found that, despite plaintiff's mental impairments, plaintiff was capable of understanding and remembering simple and moderately complex instructions, and able to sustain concentration and persistence on simple and moderately complex tasks.  (Tr. 172).  Dr. Carter expressed the opinion that plaintiff's social functioning was only mildly impaired.  (Id.).  The residual functional capacity is also supported by plaintiff's own testimony regarding his part-time work and his ability to perform his past work as a molding machine operator.  Thus, the ALJ's residual functional capacity determination is supported by substantial evidence in the record.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this 21st day of September, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE